IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

| | |
|---|---|
| SHERMAN P. HAWKINS | Cause No. CV 07-81-H-DWM-RKS |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| MIKE FERRITER, et. al. | |
| Defendants. | |

At issue are Defendants' Motion to Dismiss for failure to exhaust administrative remedies (Document 37), Defendants' Motion for Summary Judgment based upon Qualified Immunity (Document 49), Plaintiff's Cross-Motion for Summary Judgment (Document 56), and Plaintiff's Motion for Sanctions for Abuse of Process and Professional Misconduct. (Document 71).

## I. STATEMENT OF THE CASE

### A. Jurisdiction

Plaintiff's Amended Complaint alleges violations of the First Amendment and the Religious Land Use and Institutionalized Persons Act.  The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

### B. Parties

Plaintiff, a state prisoner proceeding pro se, is incarcerated at the Montana State Prison in Deer Lodge, Montana.  He was granted leave to proceed in forma pauperis on January 18, 2008.  (Document 6).  He has now paid the statutory filing fee for this matter. (Document 9).

The remaining Defendants in this matter are:  Mike Ferriter, Director of the Montana Department of Corrections; Mike Mahoney, Warden, Montana State Prison; Leonard Mihelich, Associate Warden, Montana State Prison; Myron Beeson, Associate Warden, Montana State Prison; and Ross Swanson, Deputy Warden, Montana State Prison. (Document 14–Amended Complaint, p. 3, ¶ III(B)).

### C. Allegations

Plaintiff was housed in a locked housing unit in the Maximum Security

section of the prison from March 12, 2007 until September 27, 2008.  Plaintiff is a

practicing Catholic and for the year and a half he was held in Max he was denied

Catholic Sacraments such as Confession, Eucharist, and Mass and denied

participation in celebrations of church holidays such as Palm Sunday, Ash

Wednesday, and Easter. (Document 14–Amended Complaint, p. 7, ¶ V).  He

contends all of these are very important and essential to Catholics.  (Document

14–Amended Complaint, p. 6).

## II.  MOTION TO DISMISS

Defendants first moved to dismiss Plaintiff's allegation that he was deprived

of a rosary and other religious material for failure to exhaust administrative

remedies.  Plaintiff concedes he "never stated a claim that any Defendant took his

Rosary or Bible." (Document 48–Response to Motion to Dismiss, p. 2).

Accordingly, to the extent Plaintiff's Amended Complaint could be read to raise a

claim regarding denial of his Rosary and/or Bible, that claim will be recommended

for dismissal without prejudice.  Defendants' motion is therefore granted.

## III.  MOTION FOR SUMMARY JUDGMENT

Defendants also moved for summary judgment based upon qualified

immunity.  A party is entitled to summary judgment if they demonstrate "there is

no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed.R.Civ.P. 56(c).  Summary judgment is

appropriate where the documentary evidence produced by the parties permits only

one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

    The party seeking summary judgment bears the initial burden of setting

forth the basis of the motion and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any, which demonstrate the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

    Where the moving party meets this burden, the party opposing the motion

"may not rest upon the mere allegations or denials of his pleading, but . . . must

set forth specific facts showing that there is a genuine issue for trial." *Anderson,*

*477 U.S. at 248*.  The non-moving party may do this by use of affidavits (including

his own), depositions, answers to interrogatories, and admissions.

    "A verified complaint may be used as an opposing affidavit under Rule 56."

 *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (citing *McElyea v.*

*Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987)).  "To function as an opposing

affidavit, however, the verified complaint must be based on personal knowledge

and set forth specific facts admissible in evidence." *Schroeder*, 55 F.3d at 460 (citing Fed.R.Civ.P. 56(e); *McElyea*, 833 F.2d at 197; *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)).

Plaintiff "must produce at least some 'significant probative evidence tending to support the complaint.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citations omitted).  Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. *Anderson*, 477 U.S. at 248.  At the summary judgment stage, the Court does not weigh the evidence or determine the truth of the matter, but ascertains whether there is a genuine issue for trial.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249-50.

> The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. at 252.

A district court may only consider admissible evidence in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(e); *Orr v. Bank of Am.*, 285 F.3d

764, 773 (9th Cir. 2002).[1]  Unauthenticated documents and hearsay evidence are

inadmissible, and consequently, may not be considered on summary judgment.

Orr, 285 F.3d at 773-74, 778.

## IV.  UNDISPUTED FACTS

On March 12, 2007, Plaintiff was placed in a detention cell in the Maximum

Security Building of Montana State Prison pending an investigation regarding an

escape attempt.  (Document 14–Amended Complaint, p. 4, ¶ IV(A)(1); Document

46-2:  Reich Affidavit, ¶ 8).  On April 4, 2007, Plaintiff was found guilty of

conspiracy to commit escape and sanctioned with thirty days detention.  On April

5, 2007, Plaintiff was reclassified to administrative segregation in the maximum

security unit of the prison. (Document 46-2:  Reich Affidavit, ¶ 8; Document 52-5:

Wilson Affidavit, ¶ 8; Document 58–Plaintiff's Statement of Undisputed Facts, ¶

2).[2]  Plaintiff remained in the Max Unit until September 28, 2008.

Plaintiff is a baptized Roman Catholic who attended almost every Mass held

at the prison over the past many years.  (Document 14–Amended Complaint, p. 4,

---

[1]Fed.R.Civ.P. (e)(1) provides: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

[2]The parties refer to the area where Plaintiff was housed from March 2007 until September 2008 as a locked housing unit, administrative segregation, and the maximum security unit.  The terms are used interchangeably in the parties briefs and in this Order.

¶ IV(A)(1)).  Prior to March 16, 2007, Plaintiff was allowed to see a priest on Ash
Wednesday to receive ashes and on Palm Sunday to receive palms–items allowed
in the Max Unit.  (Document 58–Plaintiff's Statement of Undisputed Facts,  ¶ 14).
On March 16, 2007, after being placed in Max, Plaintiff sent a request to see his
priest, Fr. Porter.  Plaintiff was allowed to see Fr. Porter in Max on March 30,
2007 and April 1, 2007.  On April 8, 2007, Plaintiff saw and briefly spoke to Fr.
Porter on the sidewalk of the Max Unit.  (Document 58–Plaintiff's Statement of
Undisputed Facts,  ¶ 3).

Thereafter, Plaintiff requested a visit from Fr. Porter but the requests were
never answered and Fr. Porter did not return to the Max Unit.  (Document
58–Plaintiff's Statement of Undisputed Facts,  ¶ 5).  Staff told Plaintiff Fr. Porter
was ill, on vacation, or doing other religious activities. (Document 58–Plaintiff's
Statement of Undisputed Facts,  ¶ 8; Document 58-2--Plaintiff's affidavit, ¶ 6).
Plaintiff sent notes to Fr. Porter on May 23, 2007 and June 15, 2007.  Both notes
were both answered by the Religious Activities Coordinator, Tom Wilson.
(Document 48-2, pp. 1-2).  Tom Wilson advised Plaintiff, "Father Porter's
schedule is currently limited to Mass and Confession at the RAC on Saturdays."
(Document 48-2, p. 2).  Ultimately, Fr. Porter sent Plaintiff a note explaining he

was ordered to stop going to the Max Unit. (Document 58–Plaintiff's Statement of Undisputed Facts, , ¶ 8).

Plaintiff filed grievances but was told Fr. Porter's schedule would not permit his visit to Max.  Plaintiff sent an informal grievance on June 18, 2007 asking to see his priest (Document 48-2, p. 4); on June 26, 2007, Plaintiff sent a formal grievance asking to see Fr. Porter (Document 48-2, p. 5); on July 2, 2007 Plaintiff appealed to Warden Mahoney stating if he could not see Fr. Porter, he should be escorted to the Religious Activities Center for confession and mass (Document 48-2, p. 6); and on July 7, 2007 Plaintiff appealed to Director Ferriter stating he was not allowed to go to Mass, have confession, receive Eucharist, and none of his letters got to Fr. Porter.  (Document 48-2, p. 7).  On August 2, 2007, Director Ferriter responded to Plaintiff's final appeal stating, "Fr. Porter has a limited amount of time in which to provide Catholic services to all of the inmates. Unfortunately, he is not able to visit the Max building within this time-frame. This, however, does not preclude you from practicing your religion."  (Document 48-2, p. 8).

Father Robert A. Porter is an ordained Catholic Priest within the Helena Diocese serving at the Immaculate Conception Parish in Deer Lodge, Montana.

Fr. Porter has served at the Montana State Prison since 2005 to provide Roman
Catholic inmates the opportunity for Mass and Reconciliation.  (Document 74-2:
Porter Affidavit, ¶ 2).  Prior to April 2007, the Catholic priest was always allowed
to go to the locked housing units of the prison.  (Document 58, ¶ 12).

In April 2007, Fr. Porter met with Warden Mahoney and Assistant Warden
Leonard Mihelich to discuss Fr. Porter's schedule at the prison.  Pursuant to that
meeting, Fr. Porter was directed to only conduct Mass and Reconciliation one day
a week at the prison's Religious Activities Center, for high side and low side
general population inmates.  This directive revoked Fr. Porter's access to the
locked housing units including Max where Plaintiff was housed.  (Document 74-2:
Porter Affidavit, ¶ 5).  At the time of the meeting, Fr. Porter did not understand
why the Warden issued the directive.  Fr. Porter is now aware (although there is no
evidence as to when he became aware or how he became of aware) that the April
2007 directive was a result of the Warden's concern that Fr. Porter's activities in
the locked housing units breached security protocol and potentially compromised
his safety and the safety of others in the facility.  (Document 74-2:  Porter
Affidavit,  ¶ 6).[3]  Thereafter, Fr. Porter was not approved to visit the locked

---

[3]There is no indication in the record what safety and security concerns prompted the
Warden's concern.

housing units.  (Document 52-4--Swanson Affidavit, ¶ 7; Document 52-5--Wilson Affidavit, ¶ 11).

Montana State Prison employs a Religious Coordinator and Religious Advisors.  As a general rule, the Religious Coordinator and Religious Advisors perform secular duties to facilitate ministry.  Actual ministry is conducted by religious volunteers.  (Document 52-5: Wilson Affidavit, ¶ 4; Document 52-4: Swanson Affidavit, ¶ 4).  Inmates in locked housing units are allowed religious texts, allowed to engage in personal study and prayer in their cells, and allowed non-contact visits with approved religious volunteers.  (Document 52-4:  Swanson Affidavit, ¶ 7; Document 52-5:  Wilson Affidavit, ¶ 10).  If a need arises for an approved and screened representative to counsel and pray with a locked housing inmate, the Religious Coordinator or Religious Advisors will arrange for a non-contact visit in the locked housing unit and escort the religious volunteer to and from the locked housing unit.  (Document 52-5:  Wilson Affidavit, ¶ 7; Document 52-4:  Swanson Affidavit, ¶ 5).

MSP Policy 5.6.1(IV)(D)(4) (revision date 9-30-03) provides:  "When a representative of a faith to which an inmate subscribes is not available, the Religious Coordinator, in response to an inmate's formal request, shall facilitate

contact with an approved and credentialed representative by means of telephone or whatever correspondence is practical, and meet the mandate of reasonable accommodation."  (Document 52-3, MSP 5.6.1(III)(D)(3), p. 9).  This policy was revised September 1, 2007 to read, "[w]hen there is no approved volunteer for a faith group to which an inmate subscribes, the Religious Coordinator, in response to an inmate's formal request, will facilitate contact with an approved and credentialed representative by whatever correspondence is practical."  (Document 52-2).

On September 27, 2008, Plaintiff was reclassified to close custody and moved back into general population on the high side of the prison.  Since September 27, 2008, Plaintiff's classification allows him to attend mass and schedule confession with Fr. Porter at the Religious Activities Center.  (Document 52-4, ¶ 9).

## V.  QUALIFIED IMMUNITY

Qualified immunity shields government actors from a suit for damages if a reasonable official could have believed their conduct was lawful, in light of clearly established law and the information possessed by the official.  *Anderson v. Creighton*, 483 U.S. 635, 637-39, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

That is, when a constitutional violation occurs, "law enforcement officers nonetheless are entitled to qualified immunity if they act reasonably under the circumstances." See *KRL v. Estate of Moore*, 512 F.3d 1184, 1189 (9th Cir. 2008) (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).

The United States Supreme Court outlined a two-step qualified immunity analysis in *Saucier v. Katz*, 533 U.S. 194 (2001), requiring district courts to first determine whether the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If no constitutional right was violated, the court need not inquire further. If a constitutional violation has occurred, the court's second inquiry under *Saucier* is to ask whether the law was "clearly established" at the time of defendant's alleged misconduct. *Saucier*, 533 U.S. at 201.

Recently, the Supreme Court held that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Following *Pearson*, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. The sequence set forth in *Saucier* remains beneficial in

many situations.  *Pearson*, 129 S.Ct. at 818.  The *Saucier* sequence will be

followed herein.

## VI.  FIRST AMENDMENT RIGHT TO FREE EXERCISE OF RELIGION

The First Amendment to the United States Constitution states in pertinent

part, "Congress shall make no law respecting an establishment of religion, or

prohibiting the free exercise thereof. . . ."  In order for a religious claim to merit

protection under this clause, the claim must first meet two criteria:  (1) the

proffered belief must be sincerely held; and (2) "the claim must be rooted in

religious belief, not in 'purely secular' philosophical concerns." *Callahan v.*

*Woods*, 658 F.2d 679, 683 (9th Cir. 1981).   That is, "whether the plaintiff's claim

is related to his sincerely held religious belief." *Malik v. Brown*, 16 F.3d 330, 333

(9th Cir. 1994); *see also Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008).  If a

regulation infringes on a "sincerely held religious belief" it is only valid if it is

"reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S.

78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

In this case, Defendants do not dispute the sincerity of Plaintiff's religious

beliefs nor do they contest that practicing Catholics attend Mass, take communion,

and receive reconciliation.  Moreover, Defendants acknowledge that restricting the

movement of the religious volunteer, coupled with the restrictions placed on inmates in administrative segregation, substantially burdened Plaintiff's religious exercise.  Therefore, the issue turns to whether the prison's regulation (the restriction on Fr. Porter coupled with the restriction on administrative segregation inmates) was reasonably related to legitimate penological interests.

The relevant *Turner* factors in determining whether a regulation, or its application in a particular situation, is reasonable are:  (1) whether there is a valid, rational connection between the regulation and a legitimate and neutral government interest, (2) whether there are alternative means of exercising the constitutional right, (3) the impact the accommodation of the right will have on prison staff and other prisoners, and (4) whether the regulation is an exaggerated response to prison concerns, in light of readily available alternatives. *Turner*, 482 U.S. at 89-91.

1.  Connection between regulation and governmental legitimate interest

Unfortunately, there is no way to analyze whether there is a valid rational connection between the regulation of not allowing Fr. Porter into the maximum security area of the prison and a governmental interest because there is no admissible evidence regarding what "legitimate and neutral government interest"

was behind that restriction.  Deputy Warden Ross Swanson testified by affidavit that, "[i]n March 2007, Mike Mahoney, Warden MSP revoked Rev. Porter's approval to go into the locked housing units at MSP due to certain safety and security policy violations" and Rev. Porter was not allowed into locked housing units because of "these incidents." (Document 52-4:  Swanson Affidavit, ¶ 6). There is no testimony as to how (or even if) Deputy Warden Swanson was aware of the "safety and security policy violations"; there is no testimony from Associate Mihelich or Warden Mahoney as to why the April 13, 2007 directive restricting Fr. Porter's duties was issued; and there is no testimony as to what were the "safety and security policy violations."  In short, there is no evidence which provides any insight into why Fr. Porter's presence in the Max Unit threatened the security or operation of the prison.

Courts are to accord great deference to prison officials' assessments of their interests.  *See, e.g., Turner*, 482 U.S. at 84-85, 89; *O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400 (1987).*  Nevertheless, prison officials must "put forward" a legitimate governmental interest to justify their regulation, *Turner, 482 U.S. at 89*, and must provide evidence that the interest proffered is the reason why the regulation was adopted or enforced.  *Swift v. Lewis*, 901 F.2d 730, 732

(9th Cir. 1990) ("prison officials must at least produce some evidence that their policies are based on legitimate penological justifications").  "Prison authorities cannot rely on general or conclusory assertions to support their policies.  Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual basis for their policies and that the polices are reasonably related to the furtherance of the identified interests.  An evidentiary showing is required as to each point."  *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990).

In making this finding in *Walker*, the Ninth Circuit cited with approval the Seventh Circuit case of *Caldwell v. Miller,* 790 F.2d 589 (7th Cir. 1986). *Caldwell* examined whether a ban on group religious activities instituted after an episode of inmate violence at the federal penitentiary in Marion, Illinois violated Plaintiff's right to free exercise of religion.  In late October 1983, after an incident of inmate violence in which an inmate and two guards were killed, the Warden locked down the institution, suspending all inmate activities, including banning all group religious services.  Plaintiff Caldwell, a Catholic, claimed the ban infringed on his ability to worship.  The *Caldwell* defendants presented affidavit testimony from a paralegal specialist at Marion stating the institution had implemented a

number of changes in order to secure "a safer environment for both the inmate population and staff." *Caldwell*, 790 F.2d at 597.  The Seventh Circuit held it was "critically important then that the record reveal the manner in which security considerations are implicated by the prohibited activity." *Caldwell*, 790 F.2d at 597.  Ultimately, the Seventh Circuit remanded the case concluding,

> neither we nor the district court have any way of determining, based on the record, whether the continuing ban on group religious activities at Marion was reasonably adapted to achieving an important correctional goal. The interest in preserving order and authority in a prison is self-evident, and internal security is 'central to all other correctional goals.' Nonetheless, in the absence of evidentiary support, Miller's assertion that a total ban on all group religious services is and was reasonably necessitated by security considerations is conclusory, and hence, an insufficient basis for summary judgment.

*Caldwell*, 790 F.2d at 598-99 (*quoting Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804-05, 41 L.Ed.2d 495 (1974)) (citations omitted).

The First Amendment requires that security considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review. *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804.

The United States Supreme Court has recognized that "[i]t is the business of prison officials, of course, to maintain order within their institutions.  But this fact

does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security.  Routine and automatic arguments to this effect have been made before and have been rejected by this Court." *Cleavinger v. Saxner*, 474 U.S. 193, 207, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985) (*citing Johnson v. Avery*, 393 U.S. 483, 486-487, 89 S.Ct. 747, 749-750, 21 L.Ed.2d 718 (1969); *Lee v. Washington*, 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Ex parteHull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

Defendants' argument falls squarely within the Supreme Court's caveat.  It is conclusory as they provided no explanation regarding what safety and security policy violations prompted the restriction on Fr. Porter's access to the Max Unit of the prison.  Deputy Warden Swanson's testimony that Warden Mahoney had security concerns is not only inadmissible hearsay, it is insufficient to justify the denial of Plaintiff's religious practice.  Thus, there is a genuine issue of material fact regarding whether there is a valid rational connection between the regulation banning Fr. Porter from Max and a legitimate and neutral governmental interest.

### 2.  Alternative means of exercising religious right

The second *Turner* factor asks whether Plaintiff had alternative means of

practicing his religion.  "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, we are to determine whether the inmates have been denied all means of religious expression."  *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993)(*citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52, 107 S.Ct. 2400, 2406 (1987)).  In *O'Lone,* the Muslim plaintiffs were denied the opportunity to attend Jumu'ah, the Muslim weekly religious service but they had the virtually unlimited right to congregate for prayer and discussion outside of working hours.  Moreover, the Muslim prisoners had free access to an imam, a Muslim prayer leader, whom the state provided.  The Muslim prisoners were given special meals, and special arrangements were made during the month-long observation of Ramadan, a period of fasting and prayer, to allow them to take their meals at the religiously prescribed times.  *O'Lone,* 482 U.S. 342.

In contrast, here Plaintiff's ability to participate in religious observances was significantly circumscribed.  Plaintiff had little, if any, access to a priest, he had no access to religious services, he could not participate in holy days and celebrations, he could not partake in communion or reconciliation, nor could he congregate with other practitioners of his faith for prayer and discussion.

Moreover, Plaintiff was denied these religious practices for a year and a half (from April 2007 until September 2008).

Defendants argue Plaintiff had access to religious texts and had the ability to engage in personal study and prayer in his cell.  A similar argument was made in *Ward* where the Ninth Circuit held, "we cannot conclude that the opportunity to engage in private prayer is enough to satisfy the second *Turner* factor as interpreted by *O'Lone*.  If it were, the factor would have no meaning at all because an inmate would always be able to pray privately."  *Ward*, 1 F.3d at 877 (*citing Sample v. Borg*, 675 F.Supp. 574, 580 (E.D.Cal. 1987), vacated as moot, 870 F.2d 563 (9th Cir. 1989)).

Plaintiff's religious practice was drastically curtailed by Defendants from April 2007 until September 2008.  Defendants provided no alternative for Plaintiff to exercise his religious rights.  As such, the second *Turner* factor weighs in his favor.

       3.   <u>Impact of Accommodation</u>

The third *Turner* factor is the "impact [the] accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally." *Shakur v. Schriro*, 514 F.3d 878, 886 (9th Cir. 2008).  The two possible means of

accommodation suggested by the parties were moving Plaintiff out of the Max unit or escorting Fr. Porter into the Max unit.

Reclassifying Plaintiff out of Maximum security would not be a feasible alternative given the facts presented.  Plaintiff had been found guilty of conspiracy to escape.  The prison must be allowed to classify inmates found to be escape risks in the most protective units necessary.  The Court will not question the prison's classification of Plaintiff to the Maximum security unit of the prison.

However, there is no evidence upon which to analyze the impact of accommodating Plaintiff by escorting Fr. Porter into the Max unit.  Even accepting the hearsay evidence that Fr. Porter was restricted from entering the Max unit for safety and security reasons, there is no way to analyze what impact escorting Fr. Porter to Max would have on the prison without further evidence regarding what specific safety and security concerns prompted the restriction.  Fr. Porter's affidavit indicates he was told (sometime after April 2007) that his "activities in the locked housing units breached security protocol and potentially compromised [his] safety and the safety of others in the facility."  (Document 74-2, p. 2).  But there is no evidence as to what those breaches of security protocol entailed. Moreover, as Fr. Porter was never advised of those security breaches, it appears

the prison did not provide Fr. Porter an opportunity to correct those breaches.  If these breaches of security were minor infractions, it would seem appropriate to have advised Fr. Porter of the problems and provided sufficient escorts and monitoring to ensure such breaches did not occur in the future.  The Court has no way of analyzing what impact such accommodation would have had on the prison.

In *Ward*, the issue involved what impact providing a kosher diet would have on the prison.  The Ninth Circuit held, "[a]lthough we must give deference to the prison official's own assessment of the burden on prison operations, we cannot simply accept the warden's assertion on appeal that the disruption would be significant."  *Ward*, 1 F.3d 878-879.  Here, Defendants did not even present testimony from Warden Mahoney as to why the decision was made or what impact allowing Fr. Porter into Max would have had on the prison.  Thus, the Court cannot determine whether this factor weighs in favor of the Plaintiff or Defendants.  This is a factual question which cannot be resolved on this record.

4.  Alternatives to Regulation

The fourth *Turner* factor requires the Court to consider whether there are ready alternatives which would accommodate Plaintiff at a de minimis cost to the

prison.  "The absence of ready alternatives is evidence of the reasonableness of a prison regulation, while the existence of alternatives may be evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns. " *Ward*, 1 F.3d at 879 (citing *Harper*, 494 U.S. at 225, 110 S.Ct. at 1038 and *Turner*, 482 U.S. at 90-91, 107 S.Ct. at 2262).

The parties suggest two alternatives:  obtaining a different Catholic priest who could be approved to enter the Max unit and escorting Plaintiff to the Religious Center to participate in religious services.

Defendants contend neither alternative would be feasible.  They assert there were no other Catholic priests available to take Fr. Porter's place and escorting Plaintiff outside of the Max unit to the Religious Activities Center would have a significant impact on staff, other inmates, and resources at the facility.  Defendants arguments are not persuasive.

First, Deputy Warden Swanson's testimony that "[a]ccordingly to the Helena Diocese, Rev. Porter is the only Catholic priest currently available to service the inmates at MSP" (Document 52-4:  Swanson Affidavit, ¶ 6), constitutes inadmissible hearsay.  There is no evidence this information was given directly to Deputy Warden Swanson and no evidence this alternative was explored

during the time period Plaintiff was seeking religious services in Max.

Defendants' own policies require that upon request the Religious Coordinator

"will facilitate contact with an approved and credentialed representative by

whatever correspondence is practical."  There is no evidence this was attempted,

that the Helena Diocese was contacted during the relevant period of April 2007

through September 2008, or that any other alternatives were considered during the

relevant time period.

Defendants next contend segregation inmates are not allowed contact with

general population inmates.  Therefore, if a segregation prisoner were allowed at

the Religious Activities Center, general population inmates would be prohibited

from access thereto.  (Document 52-4:  Swanson Affidavit, ¶ 8).  Plaintiff asserts

all escorted segregation inmates involve interaction or mixing with other inmates,

escorting a segregation inmate to the Religious Activities Center would involve

little interaction with other inmates, and the Religious Activities Center schedule

has hours in every day when no inmates are using or are in the chapel.  (Document

58–Plaintiff's Statement of Undisputed Facts, ¶¶ 5, 6; Document 58-2:  Plaintiff's

Affidavit, ¶ 16; Document 58-6:  Religious Activities Center schedule).

Finally, Defendants argue moving Plaintiff to the Religious Activities

Center "was not feasible as moving segregation prisoners, require a two-guard escort." (Document 52-4:  Swanson Affidavit, ¶ 8).  This argument is insufficient for two reasons.  First, Defendants do not explain why it was not feasible to use two guards to escort Hawkins to the Religious Activities Center.  There is no evidence regarding what impact this alternative would have on the prison.

Moreover, Plaintiff disputes this evidence arguing whenever he is escorted outside of MAX (to go to the infirmary, etc.) he is only escorted by one guard. (Document 58-2:  Plaintiff's Affidavit, ¶ 15).  In their reply, Defendants argue using just one guard to escort segregation inmates outside of Max would leave the unit short staffed to manage meals, mail, and conduct other inmate moves to the infirmary, recreation, work assignments, and visiting.  The problem with this argument is there is no evidence in the record to support it.  There is no testimony that having one guard escort Plaintiff to the Religious Activities Center would leave the Max unit short staffed.

Thus, there is a genuine issue of material fact regarding whether Plaintiff has alternative means of practicing his religion.

Given the disputed issues of fact set forth above, the Court cannot say Defendants or Plaintiff are entitled to summary judgment on Plaintiff's First

Amendment claim.  Moreover, in 2007, it was clearly established law that a prison's regulations which infringe on a sincerely held religious belief are only valid if reasonably related to legitimate penological interests.  There are genuine issues of material fact regarding whether the ban on Fr. Porter's presence in the Max unit was reasonably related to legitimate penological interests and therefore qualified immunity is not appropriate at this time.

## VII.  DISCRIMINATION UNDER THE FOURTEENTH AMENDMENT

Plaintiff alleges during his time in segregation when he was denied access to religious services, other religious groups were allowed to visit inmates in the Max Unit.  In his Amended Complaint, Plaintiff alleged Buddhist, Odinist, Satanist, and Seven-day Adventist were allowed access to all Max inmates. (Document 14, p. 5).  In his Statement of Undisputed Fact Plaintiff explained that Native Americans were allowed gather outside their cells in the Max yard for a Smudge Ceremony once a week, Buddhist would meet in the visiting room, and the Religious Coordinator would bring Protestant lay-persons to each cell to administer to inmates.  (Document 58–Plaintiff's Statement of Undisputed Facts, , ¶ 10).

While Defendants did not specifically address this as a separate claim they

did argue the prison did not authorize out-of-cell religious activities in any of the
locked housing units.  (Document 52-4:  Swanson Affidavit, ¶ 5).  Plaintiff
disputes this evidence testifying "Defendants did allow out-of-cell religious
activities such as the smudge for the Indians, church for the Protestants and others
having meeting at yard or visiting room – including Catholic." (Document 58-2:
Plaintiff's Affidavit, ¶ 21).

Defendants' reply brief argued that in September 2007 the policy was
changed to prohibit all out of cell religious activities but there is no sworn
testimony or documentation to support this argument.  Presumably there was a
policy change as Plaintiff alleged in his Amended Complaint that the prison
response to his grievances regarding equal treatment was to stop all religious
activities in Max.  (Document 14–Amended Complaint, p. 6).  Plaintiff contends
Defendant Ferriter instructed Defendant Mihelich to resolve the equal access
problem by stopping all religious activities in Max and Defendants then told
inmates the stoppage of religious activities was Plaintiff's fault. (Document
58–Plaintiff's Statement of Undisputed Facts,  ¶ 11).

The United States Supreme Court in *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct.
1079 (1972) held that denying a prisoner a "reasonable opportunity of pursuing his

faith comparable to the opportunity afforded fellow prisoners who adhere to

conventional religious precepts" constitutes discrimination in violation of the First

and Fourteenth Amendments. *Cruz*, 405 U.S. at 322, 92 S.Ct. at 1081-1082.

Plaintiff has presented a genuine issue of material fact regarding whether he was

denied such a comparable opportunity, at least with regard to the time period of

April 2007 until September 2007.

## VIII.  RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §

2000cc et seq. , provides in relevant part:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . . even
> if the burden results from a rule of general applicability, unless the
> government demonstrates that imposition of the burden on that person
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling
>> governmental interest.

42 U.S.C. § 2000cc-1(a).

Claims brought under RLUIPA are subject to a strict scrutiny standard, as

opposed to the reasonableness standard employed in cases involving constitutional

violations. *See Henderson v. Terhune*, 379 F.3d 709, 715 n. 1 (9th Cir. 2004).

RLUIPA mandates a stricter standard of review for prison regulations that burden

the free exercise of religion than the reasonableness standard outlined above under

*Turner*. *Shakur*, 514 F.3d at 888.

To establish a RLUIPA violation, the plaintiff bears the initial burden to

prove the defendants' conduct places a "substantial burden" on his "religious

exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Once the

plaintiff establishes a substantial burden, defendants must prove the burden both

furthers a compelling governmental interest and is the least restrictive means of

achieving that interest. *Warsoldier*, 418 F.3d at 995. RLUIPA is "to be construed

broadly in favor of protecting an inmate's right to exercise his religious beliefs."

*Warsoldier*, 418 F.3d at 995 (citing 42 U.S.C. § 2000cc-3(g)).

Defendants acknowledge that restricting the movement of the religious

volunteers, coupled with restrictions placed on inmates in administrative

segregation, substantially burdened Plaintiff's religious exercise while he was in

administrative segregation. (Document 51, p. 12). But, as discussed above, there

is no evidence regarding what compelling state interest required the banning of Fr.

Porter from the Max Unit and there is insufficient evidence to establish that such a

ban was the least restrictive means of meeting the compelling state interest.

Accordingly, both Defendants and Plaintiff's Motions for Summary Judgment on

the RLUIPA claims fail.

In 2007, it was clearly established law that a prison's regulations which place a substantial burden on a plaintiff's religious exercise is only valid under RLUIPA if it furthers a compelling governmental interest and is the least restrictive means of achieving that interest.  There are genuine issues of material fact regarding whether the ban on Fr. Porter's presence in the Max unit furthered a compelling governmental interest and whether it was the least restrictive means of achieving that interest.  Accordingly, qualified immunity is not appropriate at this time.

## IX.  INJUNCTIVE RELIEF

Defendants also move for summary judgment on Plaintiff's claim for injunctive relief.  A case or controversy must exist throughout all stages of a litigation.  *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (citing *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)) (holding that a former prisoner's release from prison rendered his habeas petition moot because there was no longer a case or controversy as required by Article III, § 2 of the Constitution).  If at any time during the course of litigation, the plaintiff ceases to suffer, or be threatened with,

"an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision" the matter is moot.  *Spencer*, 523 U.S. at 7; *see also Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (holding that a prisoner's civil rights action seeking injunctive relief that was brought under 42 U.S.C. § 1983 was moot because, after having been transferred from state to federal custody, he was no longer subject to the regulations he sought relief from).

In his Amended Complaint, Plaintiff sought to be returned to general population and access to his priest and religious items.  As Plaintiff is no longer housed in the Max Unit and has access to religious services, his claims for injunctive relief are moot and should be dismissed without prejudice.

## X.  MOTION FOR SANCTIONS

On May 7, 2009, Plaintiff filed a Motion for Sanctions for abuse of process, witness tampering, and filing false affidavits.  Plaintiff first argued Defendants presented false affidavits in support of their motion for summary judgment but he provided no evidence of particular falsehoods.  Although Plaintiff contends Fr. Porter's Affidavit will prove these falsehoods, he has yet to present such an affidavit.

Next Plaintiff alleges counsel for Defendants informed Fr. Porter his

affidavit would not be allowed because there was a protective order not allowing

Plaintiff to collect any discovery until the Court ordered it.  According to Plaintiff,

Fr. Porter told him he would not sign the affidavit per the instructions of

Defendants' counsel.  Plaintiff contends he filed a notice of written deposition for

Fr. Porter on April 20, 2009.  He states "this Court's Order of April 24, 2009

affirmed the Plaintiff's right to discovery of any witness not a defendant."

(Document 71, p. 4).  Plaintiff contends the Defendants and their attorneys

interfered with the deposition and would not allow Fr. Porter to attend or allow

Plaintiff to go to the Religious Activities Center.

Plaintiff requests sanctions under Rules 31 and 37 of the Federal Rules of

Civil Procedure and for the Defendants to cease their interference in Plaintiff's

non-defendant discovery.

By way of background, the Court issued an Order on April 24, 2009 stating:

Defendants filed a motion for protective order on January 28, 2009
requesting "that no discovery be had from them until further order of
the Court . . ." (Document 43).  That motion was granted.  Therefore,
Plaintiff may not seek to obtain discovery from Defendants.  But as
stated by Plaintiff, Father Porter is not a Defendant in this action.
Therefore, Father Porter (and any other witness) is free to provide a
voluntary affidavit, if they so choose, at any time regardless of the
protective order staying discovery. Therefore, the Court will not lift
the protective order at this time.

(Document 69–Order denying Motion to Life Protective Order).

In response to Plaintiff's Motion, Defendants filed an Affidavit of Fr. Porter, wherein Fr. Porter explained his decision to not sign the affidavit for Plaintiff and to not participate in the written deposition was voluntary and not done under pressure from Defendants or Defendants' counsel. (Document 74-2, ¶¶ 9-11).

Plaintiff was told by the Court he could obtain a <u>voluntary</u> affidavit from Fr. Porter, if Fr. Porter agreed to do so.  The Court did not lift the protective order which stopped all discovery under the Federal Rules of Civil Procedure (including discovery under Rule 31) until the stay was lifted.

Defendants have presented reliable evidence from Fr. Porter that he was not coerced into not signing the affidavit or participating in the written deposition. Explaining to a witness that he is under no obligation to sign a voluntary affidavit is not grounds for sanctions.

Plaintiff's Motion for Sanctions will be denied.

Based on the foregoing, the Court issues the following:

## ORDER

1.  Plaintiff's Motion for Sanctions (Document 71) is **DENIED**.

2.  The Protective Order dated February 12, 2009 is **LIFTED** and the

following schedule shall apply to all further proceedings:

    a.    All discovery shall be served by **July 17, 2009**.  Neither

        discovery requests nor discovery responses are routinely filed

        with the Court.  *See* D. Mont. L.R. 26.2(a).

    b.    Discovery responses shall be served and all discovery

        completed by **August 25, 2009**.  A duty to supplement

        discovery beyond the deadline may be imposed by Fed. R. Civ.

        P. 26(e).  The Court will not become involved in discovery

        disputes absent the moving party's compliance with Fed. R.

        Civ. P. 29 and D. Mont. L.R. 7 and 26.3(c).

    c.    Any motions with supporting briefs shall be filed and served on

        or before **September 25, 2009**.  Briefing shall be in accordance

        with Rule 7 of the Local Rules of the United States District

        Court for the District of Montana.

    d.    If no dispositive motions are filed on or before the motions

        deadline, defense counsel shall assume responsibility for

        convening a conference of all parties for the purpose of

preparing a Proposed Final Pretrial Order.  Counsel shall

ensure all tasks are accomplished as set forth in the Attachment

to this Order on or before **October 26, 2009**.  A Final Pretrial

Conference and trial date will then be set by further Order of

the Court.


Further the Court issues the following:

## RECOMMENDATION

1.  Any claim regarding Plaintiff being denied his Rosary and Bible should

be **DISMISSED WITHOUT PREJUDICE** and Defendant's Motion to Dismiss

(Document 37) should be **GRANTED**.

2.  Defendants' Motion for Summary Judgment (Document 49) should be

**GRANTED** with regard to Plaintiff's claims for injunctive relief and **DENIED**

with regard to all other claims.  Plaintiff's claims for injunctive relief should be

**DISMISSED WITHOUT PREJUDICE**.

3.  Plaintiff's Cross-Motion for Summary Judgment (Document 56) should

be **DENIED**.

4.  Defendant Ball who was named in Plaintiff's original complaint but not

in Plaintiff's Amended Complaint should be **DISMISSED WITHOUT PREJUDICE**.[4]

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to these Findings and Recommendations within ten (10) business days of the date entered as indicated on the Notice of Electronic Filing.  Any such filing should be captioned "Objections to Magistrate Judge's Findings and Recommendation."

A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation.  Failure to timely file written objections may bar a de novo determination by the district judge and may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

This Order is not immediately appealable to the Ninth Circuit Court of

_____

[4]*See Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992) (amended pleading supersedes the original pleading)

ORDER AND FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE- CV-07-81-H-DWM-RKS / PAGE 36

Appeals.  Any notice of appeal pursuant to Fed.R.Civ.P. 4(a)(1), should not be

filed until entry of the District Court's final judgment.

DATED this 3rd day of June, 2009.

*/s/Keith Strong*_____
Keith Strong
United States Magistrate Judge